FILED

2022 Mar-01  AM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BRAEONDA BELL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:19-cv-01335-ACA** |
| } | |
| **LIBERTY NATIONAL LIFE** } | |
| **INSURANCE and CLINT** } | |
| **MCCLAIN AGENCY,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION

Plaintiff Braeonda Bell is an African-American woman.  She sold life insurance for Liberty National Life Insurance ("Liberty National") for several months in 2018, working out of the Clint McClain[1] Agency ("TCMA") office in Homewood, Alabama. Ms. Bell claims that another Liberty National agent, Scott Pritchett, a Caucasian male, sexually and racially harassed her while the two worked together.

Ms. Bell filed suit against Liberty National and TCMA.  Specifically, she claims that Liberty National and TCMA subjected her to a sexually hostile work environment in violation of Title VII and a racially hostile work environment in violation of Title

---

[1] In the amended complaint and in Mr. McClain's deposition, his name and that of his agency is spelled "McClain." (Doc. 29; Doc. 44-3).  In Ms. Bell's deposition, Mr. McClain's name is spelled "McLain." (Doc. 44-1 at 6–7).  For clarity and consistency, the court will spell McClain as it is spelled in the second amended complaint and in Mr. McClain's deposition.

VII and 42 U.S.C. § 1981.  She also claims that Liberty National and TCMA are liable for intentional infliction of emotional distress and negligent and malicious training, supervision, and retention.

Currently before the court are Liberty National's and TCMA's motions for summary judgment.  (Doc. 41; Doc. 43).

The court **GRANTS** Liberty National's motion for summary judgment on all of Ms. Bell's Title VII claims against it because Ms. Bell was an independent contractor and not an employee entitled to protection under Title VII.

Ms. Bell concedes the Title VII claims against TCMA fail a matter of law.  (Doc. 54 at 17–18).  Therefore, the court **GRANTS** TCMA's motion for summary judgment on Ms. Bell's Title VII claims and will not address them further.

The court **GRANTS** Liberty National's and TCMA's motion for summary judgment on Ms. Bell's § 1981 claim for a racially hostile work environment because Ms. Bell has not created a triable issue of fact about whether Liberty National or TCMA is liable for Mr. Pritchett's conduct.

Finally, in the absence of an independent basis for jurisdiction over Ms. Bell's state law claims, the court will decline to exercise supplemental jurisdiction over those claims.

## I.      BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Liberty National and TCMA argue that the court should disregard statements in Ms. Bell's declaration and those of other Liberty National agents to the extent they refer to themselves as "employees" of Liberty National.  (Doc. 57 at 2, n.1; Doc. 58 at 3, n.2).  Liberty National and TCMA argue that this testimony does not comply with Federal Rule of Civil Procedure 56(c)(4) and Federal Rule of Evidence 701 because it consists of opinions embracing legal definitions and conclusions.  (Doc. 57 at 2, n.1; Doc. 58 at 3, n.2).  In Title VII cases, the question of whether an individual is an "employee" is a question of federal law that the court may decide at summary judgment. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339 (11th Cir. 1982).  Accordingly, the court's description of the facts does not incorporate any improper lay opinion testimony that provides nothing more than a legal conclusion that Ms. Bell or any other Liberty National agent was an employee of the company.

### 1.      The Parties and Their Relationship

Liberty National is a Texas-based company that sells life insurance and supplemental health insurance products.  (Doc. 44-5 at 5–6).  Liberty National uses what it calls a "field force" of independent agents across the country to sell its insurance.

(*Id.*).  Clint McClain is one of Liberty National's independent insurance agents.  (Doc. 44-3 at 7–8).  Mr. McClain also is an independent agency owner; he operates TCMA, a corporation that leases office space and owns office equipment that he and other Liberty National agents may use.  (*Id.* at 7).   Mr. McClain personally has a contract with Liberty National to sell its products.  (*Id.* at 10).  But TCMA and Liberty National have no legal relationship and TCMA does not receive compensation from Liberty National.  (Doc. 44-3 at 8–10; Doc. 44-5 at 7).

Ms. Bell began working as a Liberty National insurance agent in early May 2018. (Doc. 44-1 at 5, 9; Doc. 44-2 at 1).  Someone from TCMA contacted Ms. Bell in response to an online resume posting.  (Doc. 44-1 at 5).  Ms. Bell interviewed with two other Liberty National agents, Scott Pritchett and Phillip Nichols, at TCMA's Homewood, Alabama office.  (*Id.* at 6).

Mr. Pritchett conducted a second interview with Ms. Bell during which she paid $60 to purchase a temporary state insurance license and signed an independent agent's contract with Liberty National.  (Doc. 44-1 at 7; Doc. 44-2 at 2–6).  The agreement states that Ms. Bell's relationship with Liberty National was that of an independent contractor only and that nothing contained" in the agreement "shall be construed to create the relationship of employer and employee."  (*Id.* at 2).  In her deposition, Ms. Bell testified that she understood that she would work as an independent agent and that she would receive commissions from Liberty National only if she sold an insurance policy.  (Doc. 44-1 at 7, 30–31).

4

Liberty National did not set sales quotas for Ms. Bell. (Doc. 44-5 at 8). To keep her independent agent contract active, Liberty National required Ms. Bell to produce one premium application every eight weeks. (*Id.* at 7–8). But Liberty National did not require Ms. Bell to spend a certain number of hours a day selling insurance or to report her sales to Liberty National on a particular basis. (Doc. 42-1 at 10; Doc. 44-2 at 2). During the relevant period, Ms. Bell earned between $1,500 and $2,000 in commission payments from Liberty National and Liberty National issued Ms. Bell 1099 tax forms for that income. (Doc. 44-1 at 25, 31, 33).

Liberty National provided Ms. Bell with a business card template from which she printed the cards at her own expense. (Doc. 44-7 at ¶ 3). Liberty National did not reimburse her for any expenses or mileage, did not provide her with a computer, did not require her to maintain an office, did not require her to have an automobile, and did not pay her for training hours or hours spent discussing leads. (Doc. 44-1 at 7, 11, 22, 24–25, 30–31; Doc. 44-5 at 7–9). But Ms. Bell testified that Liberty National did provide her with a desk and conference room from which she could work at TCMA's office. (Doc. 53-2 at 3, ¶ 4).

During the four to six months Ms. Bell held her position, Mr. Pritchett set her hours and approved her sales leads. (Doc. 44-1 at 10–11, 33–34; Doc. 53-2 at ¶¶ 1, 3). He also led weekly meetings on Monday afternoons at the TCMA Homewood office. (Doc. 44-1 at 11–12). Ms. Bell testified that she understood that Mr. Pritchett was an

Assistant Director with Liberty National and her immediate supervisor.  (*Id.* at 7; Doc. 53-2 at ¶ 1).

2.   Alleged Hostile Work Environment

Shortly after signing her contract with Liberty National, Ms. Bell attended a three-day training in Jasper, Alabama about how to sell Liberty National insurance. (Doc. 44-1 at 8; Doc. 44-7 at ¶ 5).   After this training, Ms. Bell spent several weeks riding with Mr. Pritchett in his car, observing him in the field as he went door-to-door soliciting business.  (Doc. 44-1 at 8–9).

Around the end of May—about two or three weeks into Ms. Bell's ride-alongs with Mr. Pritchett—Mr. Pritchett began making sexually inappropriate comments toward her and twice used the term "nigga."  (Doc. 44-1 at 34).  The first incident occurred while the two were in Mr. Pritchett's car.  (*Id.* at 13).  Mr. Pritchett, a white male, told Ms. Bell that he grew up around black people.  (Doc. 44-1 at 11; Doc. 53-2 at ¶ 1).  He then told Ms. Bell that "your nigga won't eat your pussy the way I would." (*Id.*).  Ms. Bell responded that the comment was inappropriate, and Mr. Pritchett stated, "I'm a real nigga." (*Id.*).  After this incident, Ms. Bell continued riding in Mr. Pritchett's vehicle, and Mr. Pritchett made no other inappropriate comments to her while they were in the car together.  (Doc. 44-1 at 13).

But the sexually inappropriate comments continued at the office.  Approximately three weeks after the incident in car, Mr. Pritchett told Ms. Bell that her "butt sits up nice in her pants," during an office meeting with other agents.  (Doc. 44-1 at 12).

Another time, when Ms. Bell was wearing a skirt during a private meeting in Mr. Pritchett's office, Mr. Pritchett commented that Ms. Bell needed to shave her legs.  (*Id.*). During meetings with Ms. Bell and other agents in the office, Mr. Pritchett "talked about the way" Ms. Bell's dresses fit her body and said that he wanted to have sex with Ms. Bell.  (*Id.* at 13).  On another occasion, as Ms. Bell walked to the restroom, she overheard Mr. Pritchett tell another agent that her "breasts sit up nice."  (Doc. 44-1 at 13).

Ms. Bell testified that Mr. Pritchett liked what he called "black folks music" and "a couple of times" Mr. Pritchett rapped a song to her about "how good you can make a woman come."  (Doc. 44-1 at 13–14).  On one occasion after rapping the song, he called her over to his car and asked, "so you're not going to let me eat it?"  (*Id.* at 14).

Mr. Pritchett also sent Ms. Bell text messages referring to her as "babe."  (Doc. 44-1 at 21).  And he once commented to Ms. Bell, "that's why I need to marry you" after his wife became intoxicated and called Ms. Bell a "bitch."  (Doc. 44-1 at 19).

Finally, Ms. Bell testified that Mr. Pritchett touched her inappropriately twice. During a client meeting, Mr. Pritchett put his hands down the back of Ms. Bell's skirt because he said he wanted to "fix her tag."  (Doc. 44-1 at 13–14).  On a different occasion, Mr. Pritchett pulled up Ms. Bell's bra strap while they were standing outside the office.  (*Id.* at 14).

According to Ms. Bell, Mr. Pritchett also used the word "nigger" numerous times in her presence.  (Doc. 44-4 at 3, ¶ 5).  He referred to himself as a "real nigga," sang

words to music without omitting "racially offensive language such as 'nigger,'" and used "the term 'nigger' during [the] weekly Team Meetings at the McClain Agency office." (Doc. 53-2 at ¶ 3).

After nearly four and a half months selling insurance, Ms. Bell told Mr. Pritchett that she was going to report him Mr. McClain. (Doc. 44-1 at 15). According to Ms. Bell, Mr. Pritchett called Mr. McClain that night, and Mr. McClain came to the Monday morning meeting the next day. (Doc. 44-1 at 15, 35; Doc. 44-3 at 16). Mr. McClain met with Mr. Pritchett, Ms. Bell, and four other agents who worked out of TCMA's Homewood office to learn about issues that Ms. Bell and other agents were having with Mr. Pritchett. (Doc. 44-1 at 15; Doc. 44-3 at 16).

During the meeting, Ms. Bell and the other agents[2] told Mr. McClain that they believed it was inappropriate for Mr. Pritchett to use "nigger slurs" and to call them "niggers." (Doc. 44-1 at 16). They also generally complained about how he was performing as a supervisor. (*Id.*). At the end of the meeting, Mr. McClain asked Ms. Bell and the other agents if "he fixed these problems and these issues would everyone around the table want to stay with the company." (*Id.*). Some agents said yes; Ms. Bell said she did not want to stay with the company. (Doc. 44-1 at 16–17).

---

[2] Ms. Bell initially testified that the discussion at the initial meeting addressed "how inappropriate Scott was to the guys, some of the guys as far as the nigger slurs." (Doc. 44-1 at 16). She later testified that they discussed Mr. Pritchett "calling us niggers or saying nigger." (*Id.*).

8

Mr. McClain then held a second meeting with Ms. Bell and Mr. Nichols. (Doc. 44-1 at 17). That is when Ms. Bell told Mr. McClain that Mr. Pritchett was sexually harassing her, including her belief that Mr. Pritchett was coming onto her. (Doc. 44-1 at 17; Doc. 44-3 at 17). This is the first time Mr. McClain learned about Mr. Pritchett's alleged harassment. (Doc. 44-1 at 17, 37). Mr. McClain asked Ms. Bell if she wanted to report Mr. Pritchett to Liberty National, but she declined. (Doc. 44-3 at 17).

After this meeting, Ms. Bell told Mr. McClain that she wanted to continue working because she enjoyed job. (Doc. 44-1 at 18). Mr. McClain offered Ms. Bell two options: (1) she could transfer to another agency office closer to her home in Anniston, Alabama or (2) she could work directly with Mr. Nichols, instead of Mr. Pritchett. (Doc. 44-1 at 17–18, 35). Ms. Bell chose to work with Mr. Nichols. (*Id.* at 18).

No one at TCMA asked Ms. Bell to work with Mr. Pritchett again, and she never did. (Doc. 44-1 at 18, 35). Ms. Bell testified that Mr. Pritchett never harassed her or said anything inappropriate to her after the meeting with Mr. McClain and Mr. Nichols. (Doc. 44-1 at 18, 36). Ms. Bell only came to TCMA's Homewood office about two or three more times to meet with Mr. Nichols after the meeting, and she never made another complaint about Mr. Pritchett. (*Id.* at 36). About three to four weeks after Ms. Bell told Mr. McClain about Mr. Pritchett's conduct, she stopped selling insurance with Liberty National and did not take the exam for her permanent insurance license. (Doc. 44-1 at 21, 35). Her last sale took place in September 2018. (*Id.* at 35).

While she worked as a Liberty National insurance agent, neither Liberty National nor TCMA gave Ms. Bell an anti-harassment policy or conducted anti-harassment training.  (Doc. 44-1 at 8, 32; Doc. 53-2 at ¶ 2).

## II.    DISCUSSION

Liberty National and TCMA move for summary judgment on all of Ms. Bell's claims.

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318.   "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."   *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

### 1.    Title VII Claims Against Liberty National

In Counts One and Two of her amended complaint, Ms. Bell claims that Liberty National subjected her to a sexually hostile work environment based on Mr. Pritchett's alleged sexual harassment, in violation of Title VII.  (Doc. 29 at ¶¶ 16–25).  In Counts Three and Four, Ms. Bell claims that Liberty National subjected her to a racially hostile work environment based on Mr. Pritchett's alleged racial harassment, in violation of Title VII.   (Doc. 29 at ¶¶ 29–44).

Liberty National argues that it is entitled to summary judgment on all of Ms. Bell's Title VII claims because Ms. Bell was an independent contractor and not an "employee" entitled to protection under Title VII.  (Doc. 46 at 10–13).  Title VII's protection against various forms of discrimination extends only to employees, not independent contractors.  *Cobb*, 673 F.2d at 337–340.  Employment status is a question of federal law that the court may decide at summary judgment.  *Id.* at 338–339, 342.  If the court determines that Ms. Bell was not Liberty National's employee, the Title VII claims fail as a matter of law.

Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  Given the limited statutory definition, the Eleventh Circuit applies a hybrid "economic realities test" to determine whether an individual is an employee or an independent contractor.  *Cobb*, 673 F.2d at 341.  Under this test, "the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee [ ] are determinative."  *Id.*  To determine whether Ms. Bell is Liberty National's employee, the court will first examine the common law principles of agency and Liberty National's right to control Ms. Bell. Then, the court will consider the economic realities of Ms. Bell's work for Liberty National in light of the first two factors.

### a.     Common Law Principles of Agency

The Eleventh Circuit uses eleven common law principles to determine whether an individual is an employee for purposes of Title VII or an individual contractor.  They include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Cobb*, 673 F.2d at 340.

Based on the undisputed evidence, factors two, three, five, six, seven, nine, ten, and eleven all weigh in favor of a finding that Ms. Bell was Liberty National's independent contractor.  Ms. Bell's occupation was selling insurance.  Although she went through a three-day training on Liberty National products at her own expense, the evidence demonstrates that Ms. Bell applied for and worked under her own temporary insurance license from the State of Alabama.  (Doc. 44-1 at 7, 22).  In order to continue selling insurance, she was required by the State to obtain her own permanent license; she could not work under someone else's license.  (*Id.* at 21).  And to obtain her own permanent license, Ms. Bell had to pass a State examination, which demonstrates that

Ms. Bell was required to have independent skill and knowledge to perform her occupation. (*Id.*).

Liberty National did not require Ms. Bell to have a car or to maintain an office. (Doc. 44-5 at 9). With the exception of a desk and a conference room through TCMA's office which also bore Liberty National's name, Liberty National did not provide Ms. Bell with any other equipment to do her job.  (Doc. 44-1 at 7; Doc. 44-5 at 9; Doc. 53-2 at 3).  For example, Liberty National did not give Ms. Bell a computer; she had to provide her own.  (Doc. 44-1 at 7).

Liberty National did not provide Ms. Bell annual leave, retirement benefits, or a salary.  Ms. Bell's sole compensation was a commission for each Liberty National product she sold and this income was reflected by Liberty National on a 1099; Liberty National did not pay employment taxes.  (Doc. 44-1 at 31).  As for termination, the independent agent agreement that Ms. Bell executed explicitly states that each party had at the ability to terminate their relationship for any reason or without cause.  (Doc. 44-2 at 6).

Finally, the contract between Liberty National and Ms. Bell expressly states that the contract created an independent contractor relationship only and that nothing in the agreement would be construed as creating an employer/employee relationship.  (Doc. 44-2 at 2).

Ms. Bell does not argue that these factors suggest she was an employee and not an independent contractor.  (*See generally* doc. 54).  Indeed, Ms. Bell testified that she

understood she would work as an independent contractor insurance agent.  (Doc. 44-1 at 7, 31).

Ms. Bell argues that questions of fact exist about whether she was an employee or independent contractor because Mr. Pritchett, acting in his capacity as a Liberty National supervisor, set her schedule, determined the customers from whom she could solicit business, and ran the weekly Monday sales team meetings.  (Doc. 54 at 29).  There are two problems with Ms. Bell's argument.  First, the record contains no evidence suggesting that Liberty National employed Mr. Pritchett or gave him any supervisory role; that Liberty National knew that Mr. Pritchett supervised some aspect of Ms. Bell's work; or that Liberty National itself controlled Ms. Bell's work in any manner.  Second, even accepting as true that Mr. Pritchett supervised Ms. Bell for Liberty National to a degree, this one factor is not dispositive.  *See Cobb*, 673 F.2d at 341.  And as explained above, the overwhelming majority of the common law agency principles favor a determination that Ms. Bell was an independent contractor.

Accordingly, the court finds that the majority of the common law agency principles demonstrate that Ms. Bell is an independent contractor.

### b.    Right to Control

"[T]he extent of the employer's right to control the 'means and manner' of the employee's performance is the most important factor to review."  *Cobb*, 673 F.2d at 340 (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979)).  "If an employer has the right to control and direct the work of an individual, not only as to the

14

result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* (quoting *Spirides v. Reinhardt*, 613 F.2d at 831–32).

Here, Ms. Bell's independent agent agreement with Liberty National allowed Ms. Bell to: (1) develop clients by any lawful means; (2) select her own hours and work days, with no obligation to account to Liberty for her time; and (3) exercise her own judgment as to the time, routine, place, and method, and manner that she solicited business.  (Doc. 44-2 at 2).  In addition, Liberty National did not have minimum sales requirements for agents, including Ms. Bell.  (Doc. 42-1 at 8).

Ms. Bell does not dispute the terms of the parties' agreement or that she was not subject to any sales quotas imposed by Liberty National.  Instead, Ms. Bell appears to argue that questions of fact exist about Liberty National's right to control and direct her work based on Mr. Pritchett's supervision over her.  (*See* doc. 54 at 29).  Ms. Bell testified that Mr. Pritchett set her hours, approved or disapproved certain leads, and ran weekly sales agent meetings.  (Doc. 44-1 at 10–12, 33–34; Doc. 53-2 at ¶¶ 1, 3).  Construing this evidence in the light most favorable to Ms. Bell, Mr. Pritchett controlled some aspects of Ms. Bell's work while they worked together.  But the only evidence Ms. Bell cites that links Mr. Pritchett's supervision to Liberty National is her declaration in which she states that Mr. Pritchett was "an Assistant Director with Liberty National." (Doc. 53-2 at ¶ 1).  Accepting as true that Mr. Pritchett held that title, that evidence alone does not suggest that Liberty National put Mr. Pritchett in some supervisory

15

position over Ms. Bell or that it condoned the hierarchy in place at the TCMA office, much less that Liberty National knew it even existed.  In fact, as explained above, *see supra* p. 14, the record is devoid of any evidence creating a question of fact about whether Liberty National, as opposed to Mr. Pritchett, had the right to control Ms. Bell's work performance.

Accordingly, Ms. Bell has not shown that Liberty National controlled the manner or means by which Ms. Bell completed her work, indicating that Ms. Bell was an independent contractor, not an employee.

### c.    Economic Realities

Finally, the court must consider the economic realities.  Under this test, "an individual is an employee if economically dependent on the business to which he or she renders service."  *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 (11th Cir. 1993).

The record contains no evidence that Ms. Bell held another job while she sold insurance for Liberty National, which suggests that she was economically dependent on her commissions.  But "the economic realities with respect to the dependence of an individual on the employment" is not dispositive.  *Daughtrey*, 3 F.3d at 1495.  And Ms. Bell does not address economic realities in her opposition to summary judgment and fails to cite admissible evidence in support of the economic realities factor. Given that both the common law agency principles and the right of the employer to control demonstrate that Ms. Bell was an independent contractor, the court concludes that no question of fact exists concerning Ms. Bell's status as an independent contractor.

Because Ms. Bell was an independent contractor, her Title VII claims against Liberty National fail as a matter of law.  *See Cobb*, 673 F.2d at 338, 342 (affirming district court's dismissal of plaintiff's Title VII action upon a finding that the plaintiff was an independent contractor and therefore not protected by Title VII).  Therefore, the court **GRANTS** Liberty National's motion for summary judgment on Ms. Bell's Title VII claims.

> 2.    § 1981 Race Discrimination (Count Three) and § 1981 Racially Hostile Work Environment (Count Four)

In Count Three of her amended complaint, Ms. Bell claims that Liberty National and TCMA discriminated against her because of her race in violation of § 1981.  (Doc. 29 at ¶¶ 29–33).  In Count Four of her amended complaint, Ms. Bell claims that Liberty National and TCMA subjected her to a racially hostile work environment in violation of § 1981.  (*Id.* at ¶¶ 35–44).

Although Count Three is titled "race discrimination" instead of "racially hostile work environment," based on the face of the amended complaint, the court finds that Count Three advances a hostile work environment theory of liability.  In Count Three, Ms. Bell claims that she "was denied the right to work in an environment free of racial discrimination and racial slurs."  (*Id.* at ¶ 29).  The amended complaint then cites *Miller v. Kentworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002) and *Adams v. Austal*, 754 F.3d 1240 (11th Cir. 2014), both of which are cases examining hostile work environment claims.  (*Id.*).   To the extent Ms. Bell intended to assert a claim for

disparate treatment based on her race, neither the amended complaint nor Ms. Bell's brief identifies any discrete adverse employment action that Liberty National or TCMA took against her because of her race.  (*See generally* doc. 29; doc. 54).   Accordingly, the court construes Count Three to raise a claim based on a racially hostile work environment as opposed to a discrete discriminatory act.

As the Eleventh Circuit has stated, and as the parties agree (*see* doc. 45 at 22; doc. 46 at 10, n.1;  doc. 54 at 18, 20–21), "discrimination claims, including hostile work environment claims, brought under" § 1981 "are subject to the same standards of proof and employ the same analytical framework" as claims brought under Title VII.  *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009).  Thus, to establish a claim for a racially hostile work environment claim under § 1981, a plaintiff must demonstrate that: "(1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on h[er] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

The court notes that it has not located, and the parties have not cited, an Eleventh Circuit decision analyzing a § 1981 hostile work environment claim brought by an independent contractor under this framework.  And the court has doubts about the viability of this legal standard in this context because the framework falls short when

applying it to the requirement that a plaintiff prove a basis for holding some entity affiliated with the harasser liable. Nevertheless, in the absence of different guidance from the Eleventh Circuit and because the parties agree that this framework controls, the court applies it here.

Liberty National and TCMA challenge only the fourth and fifth elements of Ms. Bell's § 1981 racially hostile work environment claim which requires Ms. Bell to point to evidence creating questions of fact about whether Mr. Pritchett's harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment and whether Liberty National and TCMA are responsible for Mr. Pritchett's harassment. (*See* doc. 45 at 25–29; doc. 46 at 13–16).

Assuming that Ms. Bell has created triable issues of fact about whether Mr. Pritchett's racial harassment was severe and pervasive, her claim fails a matter of law because even accepting all of Ms. Bell's evidence as true, a reasonable jury could not find that Liberty National or TCMA is liable for Mr. Pritchett's conduct.

The fifth element of a hostile work environment claim requires a plaintiff to "demonstrate a basis for holding the employer liable for the harassment." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000). An employer's liability depends on whether the harassing employee is a co-worker or supervisor of the plaintiff. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is a co-employee of the victim, "the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at

1278.  If the harasser is supervisor, the employer "is subject to vicarious liability to a victimized employee for an actionable hostile work environment."  *Id.* (quotations omitted).  In that case, "the employer is strictly liable" if the supervisor takes a tangible employment action against the victim or if the employer cannot establish what is known as the *Faragher-Ellerth* affirmative defense.  *Vance*, 570 U.S. at 424; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, (1998); *Faragher v. Boca Raton*, 524 U.S. 775 (1998).

Liberty National and TCMA argue they are entitled to judgment as a matter of law on Ms. Bell's racially hostile work environment claim because Mr. Pritchett was an independent agent like Ms. Bell, and once Ms. Bell complained of the harassment, they took prompt remedial action.  (Doc. 45 at 28–29; Doc. 46 at 16).  In the section of Ms. Bell's brief that addresses her racially hostile work environment claim, she does not challenge Liberty National's and TCMA's proffered legal standard for imposing liability on them.   (Doc. 54 at 19–24).  In the section of Ms. Bell's brief that addresses her sexually hostile work environment claims, Ms. Bell contends that that Liberty National and TCMA are vicariously liable for Mr. Pritchett's harassment because he was her supervisor.  (Doc. 54 at 21, 24–27).  To the extent Ms. Bell claims that those arguments apply to her racially hostile work environment claim, the arguments fall short.

Ms. Bell appears to argue that Liberty National and TCMA are strictly liable under a tangible employment action theory.  (*See* Doc. 54 at 26).  But neither Ms. Bell's

amended complaint nor her brief identifies a tangible employment action that Mr. Pritchett, Liberty National, or TCMA took as a result of the harassment. (*See generally* doc. 29; doc. 54). And she has pointed to no evidence showing as much. (*See* doc. 54 at 21). Therefore, this argument is not persuasive.

Ms. Bell next argues that Liberty National and TCMA are not entitled to judgment as a matter of law on the *Faragher-Ellerth* affirmative defense because the evidence is undisputed that she did not receive an anti-harassment policy or anti-harassment training. (Doc. 54 at 25–27). But Liberty National and TCMA have not asserted the affirmative defense to liability at this stage. Rather, they argue that Mr. Pritchett was an independent sales agent, not Ms. Bell's supervisor.

So then, the question becomes whether the evidence creates triable issues of fact with respect to whether Mr. Pritchett was a "supervisor" as the law defines that term with respect to vicarious liability for a hostile work environment. The Supreme Court had held that "an employee is a 'supervisor' for purposes of vicarious liability . . . if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424. Tangible employment actions include those "effect[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). *Id.* at 431 (quotations omitted). Neither the Supreme Court nor the Eleventh Circuit has addressed whether this list is exclusive,

and neither court has elaborated further on what evidence creates triable issues of fact on whether an individual is a supervisor.

In her brief, Ms. Bell makes no argument and cites no evidence suggesting that Mr. Pritchett was a supervisor for TCMA.  (*See* doc. 53 at 24–25).  She claims that Mr. Pritchett was "the Assistant Director for Liberty National in Birmingham" and "her immediate supervisor." (Doc. 54 at 24–25).  Even if true, these titles alone do not demonstrate that Liberty National empowered Mr. Pritchett to take tangible employment actions against Ms. Bell.  Ms. Bell also cites evidence that she could not make a sale to anyone unless Mr. Pritchett gave her permission and that he denied her the opportunity to make sales on occasion.  (Doc. 42-2 at 33–34; Doc. 53-2 at 3, ¶ 3). Assuming that Mr. Pritchett's approval of Ms. Bell's sales leads constitutes a tangible employment action, she has not cited any evidence demonstrating that Liberty National *empowered* Mr. Pritchett to control her sales in that manner.  *See Vance*, 570 U.S. at 424.

Therefore, as *Vance* defines the term, Mr. Pritchett is not a supervisor for TCMA or Liberty National.  Accordingly, TCMA and Liberty National are liable for Mr. Pritchett's conduct only if they "knew or should have known of the harassment in question and failed to take prompt remedial action," *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982).  With respect to TCMA, Ms. Bell does not dispute that after she notified Mr. McClain of Mr. Pritchett's conduct, she never had to work with him again and the harassment stopped.  (Doc. 44-1 at 17–18, 35–36; *see also generally*

doc. 54).  Therefore, Ms. Bell has cited no evidence creating triable issues of fact about whether TCMA took appropriate remedial action once it knew of the harassment.

With respect to Liberty National, the undisputed evidence is that Ms. Bell declined Mr. McClain's invitation to report Mr. Pritchett to Liberty National.  (Doc. 44-3 at 19).   The record contains no evidence indicating that Liberty National knew or should have known of Mr. Pritchett's conduct.  Therefore, Ms. Bell has not established a basis for holding Liberty National liable for Mr. Pritchett's racial harassment.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (plaintiff must show that employer had actual or constructive knowledge to hold the employer liable for co-worker harassment).

Without citing any evidence, Ms. Bell's brief states in a conclusory fashion that "a reasonable jury could find that both defendants failed to take reasonable steps to prevent a racially hostile working environment."  (*Id.* at 23).  But this is insufficient to carry her summary judgment burden.

Because Ms. Bell has not shown that Liberty National and TCMA are liable for Mr. Pritchett's alleged racial harassment, her racially hostile work environment claims fail as a matter of law.   Accordingly, the court **GRANTS** Liberty National's and TCMA's motion for summary judgment on Ms. Bell's § 1981 racially hostile work environment claims.

### III.    CONCLUSION

For the reasons explained above, the court **GRANTS** Liberty National's and TCMA's motions for summary judgment on Ms. Bell's Title VII and § 1981 claims. The court will enter judgment as matter of law in favor of Liberty National and TCMA on those claims.

The remaining claims are Ms. Bell's state law claims for outrage and negligent retention, supervision, and training against Liberty National and TCMA.  Ms. Bell has not alleged a basis for this court's jurisdiction over these claims.  (*See* doc. 1).  She has not alleged that the court has diversity jurisdiction, and she has not properly alleged her citizenship or that of Liberty National or TCMA.  (*See id.* at 2–3).  Nor does the complaint allege that the amount in controversy exceeds $75,000.  (*See id.*).

In the absence of an independent basis for jurisdiction over Ms. Bell's state law claims, the court will dismiss the claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  **On or before March 8, 2022**, Ms. Bell shall show cause in writing why the court has original jurisdiction over her state law claims.

**DONE** and **ORDERED** this March 1, 2022.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE